1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  ROWDY PAUU, an individual, <br><br> 12                                        Plaintiff, <br><br> 13  v. <br><br> 14  COUNTY OF SAN DIEGO; WILLIAM GORE, in his individual capacity; DAVID LOVEJOY, in his individual capacity; JONATHON YOUNG, in his individual capacity; and DOES 1-25, <br> 17                                        Defendants. <br> 18  ————————————————— <br> 19  AND ALL RELATED CASES | Lead Case No.:  23-CV-961 TWR (SBC) (consolidated with 23-CV-2162 TWR (SBC) <br><br> **ORDER (1) GRANTING IN PART AND DENYING IN PART *PAUU* DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT, (2) GRANTING IN PART AND DENYING IN PART *TALAVERA* DEFENDANTS' MOTION TO DISMISS COMPLAINT, (3) DENYING PLAINTIFF PAUU AND *PAUU* DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE, AND (4) DENYING PLAINTIFF TALAVERA AND *TALAVERA* DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE** <br><br> (*Pauu* ECF Nos. 22, 26, 27; *Talavera* ECF Nos. 6, 6-2, 9-1) |

1

Presently before the Court are Defendants County of San Diego (the "County"), David Lovejoy, Jonathon Young, and William Gore's (the "*Pauu* Defendants") Motion to Dismiss (*Pauu* ECF No. 22, "*Pauu* Mot.") Plaintiff Rowdy Pauu's Fist Amended Complaint (*Pauu* ECF No. 21, "*Pauu* FAC") in *Rowdy Pauu v. County of San Diego et al.*, Case No. 23-CV-961 ("*Pauu*"); the *Pauu* Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss (*Pauu* ECF No. 22-1, "*Pauu* Mem."); Pauu's Opposition to Motion to Dismiss (*Pauu* ECF No. 25, "*Pauu* Opp'n"); the *Pauu* Defendants' Reply in Support of Motion to Dismiss (*Pauu* ECF No. 30, "*Pauu* Reply"); Pauu's Request for Judicial Notice and Notice of New and Additional Factual Material in Support of his Opposition to the *Pauu* Defendants' Motion to Dismiss (*Pauu* ECF No. 26, "Pauu Req."); the *Pauu* Defendants' Objection to Pauu's Request for Judicial Notice (*Pauu* ECF No. 27, the "*Pauu* Defs.' Obj."); and the *Pauu* Defendants' Request for Judicial Notice (the *Pauu* Defs.' Obj. at 2–3).

Also before the Court are the County, Lovejoy, Young, Gore, and Kelly Martinez's (the "*Talavera* Defendants") Motion to Dismiss (*Talavera* ECF No. 6, "*Talavera* Mot.") Plaintiff Eric Talavera's Complaint (*Talavera* ECF No. 1, "*Talavera* Compl.") in *Talavera v. County of San Diego et al.*, Case No. 23-CV-2162 ("*Talavera*"); the *Talavera* Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss (*Talavera* ECF No. 6-1, "*Talavera* Mem."); Talavera's Opposition to Motion to Dismiss (*Talavera* ECF No. 9, "*Talavera* Opp'n"); the *Talavera* Defendants' Reply in Support of Motion to Dismiss (*Talavera* ECF No. 11, "*Talavera* Reply"); the *Talavera* Defendants' Request for Judicial Notice in Support of Motion to Dismiss (*Talavera* ECF No. 6-2, "*Talavera* Defs.' Req."); and Talavera's Request for Judicial Notice in Support of Opposition (*Talavera* ECF No. 9-1, "Talavera's Req.").

On March 14, 2024, the Court held a hearing on the Motions to Dismiss (the "Mar. 14 Hearing"). (*See Pauu* ECF No. 31; *Talavera* ECF No. 14.) Having reviewed the Parties' submissions and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** the *Pauu* Defendants' Motion to Dismiss, **GRANTS IN PART AND DENIES**

1  **IN PART** the *Talavera* Defendants' Motion to Dismiss, **DENIES** Pauu's and the *Pauu*

2  Defendants' Requests for Judicial Notice, and **DENIES** Talavera's and the *Talavera*

3  Defendants' Requests for Judicial Notice, as follows.

4  ## LEGAL STANDARD

5  "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to

6  state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"

7  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro*

8  *v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  "A district court's dismissal for failure to

9  state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of

10  a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

11  theory.'"  *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

12  Cir. 1988)).

13  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and

14  plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v.*

15  *Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  "[T]he pleading

16  standard Rule 8 announces does not require 'detailed factual allegations,' but it demands

17  more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678

18  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "[a]

19  pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

20  cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

21  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

22  accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting

23  *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads

24  factual content that allows the court to draw the reasonable inference that the defendant is

25  liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "[W]here the

26  well-pleaded facts do not permit the court to infer more than the mere possibility of

27  misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is

28  / / /

entitled to relief.'"   *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"   *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).   "A district court does not err in denying leave to amend where the amendment would be futile."   *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

## THE *PAUU* DEFENDANTS' MOTION TO DISMISS

### I.   Background

#### A.   *Factual Background*[1]

Pauu served as a detective for the National City Police Department and the San Diego County Regional Auto Theft Task Force ("RATT").   (*Pauu* FAC ¶ 19.)   On the evening of February 16, 2022, Pauu and other RATT detectives, while surveilling the El Cajon area in plain clothes and unmarked vehicles, began pursuing Erick Talavera, whom they suspected of trailer theft.   (*Id.* ¶¶ 23–24.)   Because the task force involved catching auto thieves attempting to evade law enforcement by driving from one city to another, it required multi-jurisdiction involvement.   (*Id.* ¶ 22.)   Accordingly, the detectives contacted the Sheriff's Department for assistance with the apprehension of the suspect.   (*Id.* ¶ 25.)

The RATT detectives ended their pursuit of Talavera in a cul-de-sac.   (*Id.* ¶ 34.)   When Talavera came to a stop, Pauu and his partners situated themselves around him in the cul-de-sac and waited for the Sheriff's Department deputies to arrive.   (*Id.*)   Defendant Deputies Lovejoy and Young (the "Deputy Defendants") arrived at the scene and parked

---

[1]   For purposes of the Motions to Dismiss, the Court "must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them," and construe the Plaintiffs' operative pleadings "in the light most favorable to the plaintiff."   *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

their marked vehicle, blocking the only means for Talavera to exit the cul-de-sac.  (*Id.* ¶¶ 36, 38.)  In the meantime, Pauu positioned himself behind the suspect.  (*Id.* ¶ 37.)  While the Deputy Defendants were apprehending Talavera, he produced a knife, and the officers opened fire.  (*Id.* ¶¶ 40–46.)

According to Pauu, the Deputy Defendants started shooting at Talavera without warning in a de-escalating situation.  Specifically, Talavera neither made any movements towards the Deputy Defendants or anyone else, (*id.* ¶ 41); did not threaten anyone, (*id.* ¶ 42); and was complying with the Deputy Defendants' commands, (*id.* ¶ 43).  Further, the Deputy Defendants were about fifty feet from Talavera when he produced a knife, and Talavera was moving toward the ground as instructed by the Deputy Defendants.  (*Id.* ¶¶ 40–41).  Nevertheless, the Deputy Defendants fired their weapons 17 times at Talavera and a bullet struck Pauu in the leg.  (*Id.* ¶¶ 46–47, 59.)  Pauu did not move away before the shooting because the Deputy Defendants had failed to warn that they intended to fire their weapons.  (*Id.* ¶ 51.)  After shooting Pauu, Deputy Lovejoy admitted to members of the task force that he had seen Pauu in his line of sight but had fired anyway because he had thought he "could make the shot."  (*Id.* ¶ 61)

Pauu also faults the communication system maintained by the County in the RATT operations, which prevented the Deputy Defendants from coordinating their use of force.  Specifically, Pauu could not directly relay a message to the Sheriff's Department during the pursuit to receive backup.  (*Id.* ¶ 25.)  Instead, the method of communication required the RATT detectives to call a Sheriff's Department deputy, who would relay the message to dispatch, which in turn would relay the message to the deputies arriving at the scene.  (*Id.* ¶ 26.)  Immediately before the shooting, one of the detectives wanted to caution the Deputy Defendants about the potential for crossfire due to the positioning of the deputies when they arrived at the scene.  (*Id.* ¶ 53.)  Direct communication would have been important in this situation because it would have been dangerous for the detectives to move out from behind the safety of their car doors.  (*Id.*)  However, the detectives could not communicate those facts because they were not on the same radio channel.  (*Id.* ¶ 54)

1

### *B.      Procedural background*

2   On May 24, 2023, Pauu filed this action alleging three claims for relief under Section

3   1983 of Title 42 of the United States Code ("§ 1983").  (*Pauu* ECF No. 1, "*Pauu* Compl.")

4   On June 30, 2023, the *Pauu* Defendants moved to dismiss the Complaint.  (*Pauu* ECF No.

5   6.)   On October 3, 2023, the Court ordered the parties to supplement their briefing to

6   address whether the Fourth or Fourteenth Amendment applied to Pauu's excessive force

7   claim.  (*Pauu* ECF No. 14.)   The Court further noted that Pauu would need to amend his

8   Complaint if he believed the Fourth Amendment applied to his claims.  (*Id*.)   On October

9   26, 2023, Pauu moved for leave to file an amended complaint, and on December 23, 2023,

10   the Court granted Pauu leave to amend the Complaint and denied as moot the then-pending

11   motion to dismiss.  (*Pauu* ECF No. 19.)

12   On December 18, 2023, Pauu filed his First Amended Complaint, alleging four

13   claims for relief under § 1983: two claims against the Deputy Defendants for subjecting

14   Pauu to excessive force in violation of the Fourth and Fourteenth Amendments, a claim

15   against Defendants Gore and Does 1–25 (the "*Pauu* Supervisory Defendants") for their

16   failure adequately to train and supervise, and a *Monell* claim against the County for

17   maintaining unconstitutional policies and customs.  (*See generally Pauu* FAC.)   Because

18   both the *Pauu* and *Talavera* lawsuits arose from the same shooting that occurred in El

19   Cajon on February 16, 2022, the *Pauu* Parties and *Talavera* Parties also moved to

20   consolidate their cases.  (*Pauu* ECF No. 20.)   Finding that both cases involved common

21   questions of law and fact, the Court consolidated *Pauu* and *Talavera* and designated *Pauu*

22   as the lead case.  (*Pauu* ECF No.  24.)

23   ## II.   Analysis

24   The *Pauu* Defendants seek to dismiss Pauu's first cause of action for excessive force

25   in violation of the Fourth Amendment; second cause of action for excessive force in

26   violation of the Fourteenth Amendment; third cause of action for failure adequately to train,

27   supervise, and discipline officers; and fourth cause of action under *Monell* for

28   unconstitutional policies and customs.  (*See generally Pauu* Mem.)

### A. First Cause of Action: Unconstitutional Seizure Under the Fourth Amendment Against Lovejoy and Young

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Pauu alleges that he was seized under the Fourth Amendment when the bullet that either Deputy Lovejoy or Young fired hit him. (*Pauu* FAC ¶¶ 93–123.) In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Supreme Court observed that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 597–98. Here, the Parties disagree as to what constitutes intentional conduct for Fourth Amendment seizure purposes.

The Deputy Defendants argue that they did not seize Pauu because the force required for a Fourth Amendment seizure is not just force intentionally applied, but force intentionally applied to the target that officers sought to restrain. (*See Pauu* Mem. at 10 (citing *Hawatmeh v. City of Henderson*, 22-cv-01786-APG-DJA, 2023 WL 5796641, at *4 (D. Nev. Sept. 6, 2023)).) Pauu, on the other hand, contends that the Deputy Defendants' argument relies on a misapplication of the relevant intent requirement because courts analyze the Fourth Amendment seizure under the objective standard of reasonableness. (*Pauu* Opp'n at 10.) For example, Pauu cites to *Nelson v. City of Davis*, 685 F. 3d 867, 877–78 (9th Cir. 2012), in which the Ninth Circuit held that a seizure occurs "so long as the police action was 'not . . . the consequence of an unknowing act.'" (*Pauu* Opp'n at 11–12, quoting *Brower*, 489 U.S. at 596.) Thus, Pauu argues that a seizure occurred when the Deputy Defendants deliberately fired their weapons.[2] Defendants' counsel conceded

---

[2]     During the March 14 Hearing, Pauu's counsel contended—for the first time—that a seizure could also occur when police create a "zone of danger" by indiscriminately firing their weapon in the manner Deputy Lovejoy did—firing his gun even after seeing Pauu in his line of sight because he thought he "could make the shot." (*Pauu* FAC ¶ 61.) The *Pauu* Defendants, however, argue that case law does not support Pauu's "zone of danger" theory. Although the Court need not consider Pauu's untimely argument, *see, e.g.*, *Acasio v. Lucy*, No. 14-CV-04689-JSC, 2017 WL 1316537, at *10 (N.D. Cal. Apr. 10, 2017) ("Courts routinely refuse to consider argument or authorities raised for the first time in a reply brief

that, while a person who is not individually targeted may bring a Fourth Amendment claim under certain circumstances—such as when the person is part of a targeted or undifferentiated group—injured bystanders who are not targeted or part of a targeted group generally do not have a Fourth Amendment claim.  (*Pauu* Reply at 2–3.)

Courts analyze the reasonableness of seizures under the Fourth Amendment using an objective standard.  *See Brower*, 489 U.S. at 599 (explaining that the intention element of the seizure doctrine focuses on the officer's intent to stop rather than to harm a suspect, meaning intentionality should be measured objectively by focusing on the means used to stop a suspect).  In *Nelson*, for example, the police used pepperballs, which "combine the kinetic impact of a projectile with the sensory discomfort of pepper spray," 685 F.3d at 873, to disperse a group of students attending what one participant described as "the biggest party in history" in their college town.  *Id.* at 872–73.  The plaintiff, who was among the attendees, was shot in the eye with a pepperball.  *Id.* at 874.  The Ninth Circuit concluded that the plaintiff had been seized because the "application of force was a knowing and wil[l]ful act that terminated [the plaintiff]'s freedom of movement."  *Id.* at 877–78.  Pauu argues, as in *Nelson*, the officers' intentionality arose from their intentional pulling of the trigger.  (*Pauu* Opp'n at 11–12.)

Pauu's reliance on *Nelson*, however, is misplaced.  The question here is whether the Deputy Defendants seized Pauu when their target was Talavera.  When force is directed at a suspect, but inadvertently injures a bystander, the bystander's injury is not a seizure that implicates the Fourth Amendment because the means of the seizure were not deliberately targeted at the bystander.  For example, in *Hernandez v. City of Los Angeles*, No. 19-CV-441-CAS-GJS, 2021 WL 8820856, at *2 (C.D. Cal. Dec. 24, 2021), the plaintiff, who was on the balcony of his second-floor apartment, was hit by a stray bullet from a nearby

---

because the opposing party has no meaningful opportunity to respond.  It is even more unfair and prejudicial to raise new arguments and authorities for the first time at oral argument, taking the opposing party by surprise and affording no opportunity to respond whatsoever." (internal citations omitted)), the Court agrees with the *Pauu* Defendants.

shooting between the Los Angeles police and a suspect.  The plaintiff, relying on *Nelson*, argued, as does Pauu, that an officer need not intentionally aim at a specific person to seize them.  *Id*. at *6.  The court concluded that *Nelson* was distinguishable because, in that case, the officer's objective target was a group that included the plaintiff, whereas the plaintiff who was on his balcony was not part of a group that was the intended object of the officers' use of force.  *Id*. at *7; *see also Lopez v. City of Santa Maria*, No. 13-7287-AJW, 2016 WL 316004, at *3 (C.D. Cal. Jan. 26, 2016) (observing that, for there to be a seizure under the Fourth Amendment, the individual against whom the force was applied must have been the object of the detention or taking, and it is not enough that the act of restraint itself is intended); *Kong Meng Xiong v. City of Merced*, No. 13-CV-00083-SKO, 2015 WL 4598861, at *12 (E.D. Cal. July 29, 2015) (also distinguishing *Nelson*).  Accordingly, *Nelson* does not apply here.  The two other cases on which Pauu relies, *Sanderlin v. City of San Jose*, No. 20-CV-824-BLF, 2023 WL 2562400, at *1 (N.D. Cal. Mar. 16, 2023) and *Marroquin*, 2022 WL 18278405 at *1, similarly address the issue of seizure in the crowd-control context.

Pauu also cites to *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021), which considered the intentionality element in the context of automobile stops.  In *Villanueva*, the Ninth Circuit concluded that a passenger struck by a stray bullet aimed at a vehicle or its driver had a cognizable Fourth Amendment Claim.  As in the crowd-control context, during an automobile stop, the police act with the objective intent to stop a particular vehicle, which leads to the seizure of both the driver and the passenger.  *See id.* at 1166.  Because this case did not involve an automobile stop, *Villanueva*'s reasoning does not apply.  *See also Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir. 2000) ("By shooting at the driver of the moving car, [the police officers] intended to stop the car, effectively seizing everyone inside, including the Plaintiff.").

Finally, during oral argument, Pauu's counsel contended that Pauu's Fourth Amendment claim is viable under *Jensen v. City of Oxnard*, 145 F.3d 1078, 1081 (9th Cir. 1998).  In *Jensen*, a police officer shot at a fellow officer whom he mistook for an armed

criminal during a SWAT raid. *Id*. at 1083. The *Jensen* court upheld the Fourth Amendment claim of the deceased officer's family and observed that a "seizure occurs even when an unintended person or thing is the object of the detention or taking." *Id*. *Jensen* does not apply here. Unlike the Deputy Defendants here, the officer in *Jensen* targeted a particular individual—even though he made a mistake as to the identity of his target. Thus, the officer in *Jensen* also acted with the requisite intent for a Fourth Amendment violation. Unlike in *Jensen*, the Deputy Defendants did not shoot Pauu mistaking him for Talavera, but rather accidentally shot Pauu while aiming for Talavera. This conclusion is supported by *Rucker v. Harford County*, 946 F.2d 278 (4th Cir. 1991), in which the Fourth Circuit observed that the Fourth Amendment "does not by definition, extend to unintentionally injured 'bystanders.'" *Id.* at 281. The court noted, "a fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of physical restraint. But it does not mean [ ] that a seizure occurs just so long as the act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained." *Id*.

Consistent with the above analysis, the Ninth Circuit observed in *United States v. Lockett*, 919 F.2d 585 (9th Cir. 1990), that an innocent bystander struck by a stray bullet from an officer's weapon does not have a Fourth Amendment claim because the bystander's freedom of movement is not terminated "*through means intentionally applied*." *Id.* at 590 n.4 (emphasis in original) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)); *see also Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 946 (E.D. Cal. 2011) ("[A] plaintiff that is injured collaterally or incidentally to the application of force by police against a third party cannot maintain a Fourth Amendment claim."); *Hernandez*, 2021 WL 8820856, at *7 (observing that the Sixth, Second, and Fourth Circuits are in agreement with the Ninth Circuit that there is no Fourth Amendment claim when an innocent bystander is injured during the seizure of a third party). Here, like the Ninth Circuit's hypothetical bystander in *Lockett*, Pauu was injured when the Deputy Defendants were using force to apprehend Talavera. Accordingly, Pauu's injury is not a seizure that implicates the Fourth Amendment

23-CV-961 TWR (SBC)

because it was Talavera, not Pauu, who was the intentional target of the Deputy Defendants' force.

Because there is no Fourth Amendment violation, the Court need not analyze whether the seizure was reasonable, (*Pauu* Opp'n at 14), or whether the Deputy Defendants are entitled to qualified immunity, (*Pauu* Mem. at 19).   Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Pauu's first cause of action.   Although the Court doubts Pauu can allege any additional facts to support a Fourth Amendment claim, the Court grants him leave to amend out of an abundance of caution.   *See, e.g.*, *DeSoto*, 957 F.2d at 658 ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" (quoting *Schreiber Distrib. Co.*, 806 F.2d at 1401)).

## B.   Second Cause of Action: Substantive Due Process Violation Under the Fourteenth Amendment Against Lovejoy and Young

In the alternative, Pauu alleges a Fourteenth Amendment substantive due process claim.   (*Pauu* FAC ¶ 125.)   An excessive force claim under the Fourteenth Amendment targets arbitrary governmental action taken without legitimate governmental objectives. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).   However, "only official conduct that shocks the conscience is cognizable as a due process violation."   *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (cleaned up).   "In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation by the officer is practical."   *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (cleaned up).

Pauu asserts the Deputy Defendants were not in an emergency and had time to deliberate before firing their weapons, (*Pauu* FAC ¶ 131), and acted with deliberate indifference when they discharged their firearms even after observing that Pauu and two other officers were directly in their line of fire.   (*Id*. ¶ 130).   The Deputy Defendants challenge Pauu's allegation that they had the opportunity to deliberate before shooting.

(*Pauu* Mem. at 15.)  Consequently, they argue Pauu's Fourteenth Amendment claim should be subjected to the higher "purpose to harm" standard—which they contend Pauu does not satisfy—rather than the "deliberate indifference" standard.  (*Id*.)

Given that excessive force claims are inherently fact specific, the issue of whether the "deliberate indifference" or "purpose to harm" standard applies in a given case is generally not appropriate for resolution at the motion to dismiss stage.  *See Bui v. City & Cnty. of S.F.*, 61 F. Supp. 3d 877, 901 (N.D. Cal. 2014) (observing that at the summary judgment stage, a court may determine whether the officer had time to deliberate or instead had to make a snap judgment, "[b]ut, by its nature, the determination of which situation the officer actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards") (cleaned up)).  Accordingly, at this stage in litigation, the Court resolves the question concerning the standard of culpability based on allegations in the Complaint.  *See generally Rosales v. Cnty. of San Diego*, 511 F. Supp. 3d 1070, 1087 (S.D. Cal. 2021).

### 1. Standard of Culpability

When determining the standard of culpability, the "critical consideration is whether the circumstances are such that actual deliberation is practical."  *See Porter*, 546 F.3d at 1138 (cleaned up).  If circumstances allowed an officer time for actual deliberation, the official's deliberate indifference may suffice to shock the conscience.  *Rosales*, 511 F. Supp. 3d at 1087.  However, when the situation requires the official "to make repeated snap judgments in response to an escalating situation, the defendant must have acted with a purpose to harm unrelated to legitimate law enforcement objectives in order to shock the conscience."  *Id*.  The Ninth Circuit's inquiry extends along a spectrum beginning with "extended opportunities to do better . . . teamed with protracted failure even to care" in the prison context or "where officers have ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail to do so" on the one end against an "evolving set of circumstances that took place over a short period necessitating 'fast action'" on the other.  *Porter*, 546 F.3d at 1139–40.  Except in very limited situations, such

as those involving high-speed police car chases, where a court may categorically apply the purpose-to-harm standard, the determination of the relevant standard of culpability depends on the circumstance of each case. *Nicholson v. City of L.A.*, 935 F.3d 685, 693–94 (9th Cir. 2019). Further, while deliberate indifference requires evidence that the officer "disregarded a known or obvious consequence of his action," *id*. at 693, the demanding purpose-to-harm standard requires that the official recognized an unreasonable risk and actually intended to expose the plaintiff to that risk without regard to the consequences to the plaintiff. *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996).

The Deputy Defendants argue it is unreasonable to infer from Pauu's allegations that they had the time to deliberate when confronting a suspect who had produced a deadly weapon. (*Pauu* Mem. at 15.) Pauu, on the other hand, argues he must allege only "deliberate indifference" because the Deputy Defendants had the time to consider their actions. (*Pauu* Opp'n at 16.) Pauu contends his Fourteenth Amendment claim is viable under *Nicholson*, 935 F.3d at 685, in which bystander student plaintiffs were injured by a police officer who mistook a toy gun a suspect was holding for a real firearm. *Id.* at 689. Within seconds of observing the "gun," the officer rushed down the alleyway where the students had congregated and fired towards the suspect. *Id*. The Ninth Circuit observed that, given the plaintiffs' allegations that suspect "was not pointing the toy gun at anyone and had not given any indication that he was likely to harm anyone[,] there was no 'rapidly escalating' situation that would have deprived the officer of the opportunity to confer with his partner and formulate a plan to ascertain what was happening before charging in with gunfire." *Id*. at 694. The district court had identified certain "minimal information" situations, where the information known to officers was so minimal that the circumstances required an assessment before using deadly force, such as using deadly force on a twelve-year-old boy with a toy gun pointed downward at his side, shooting without provocation at a sixty-four-year-old man in a walker with his gun trained on the ground, using deadly force on a non-threatening man walking on the sidewalk cradling an airsoft gun, and shooting at a costumed partygoer with a fake decorated gun. *See Nicholson v. City of Los*

*Angeles*, No. 15-07594-DDP, 2017 WL 4402274, at *9 (C.D. Cal. Oct. 2, 2017), *aff'd in part*, 935 F.3d 685.  The Ninth Circuit agreed with the district court, noting "in minimal information situations, an officer must take some time to assess what is happening before employing deadly force" because "holding otherwise would result in an intolerably high risk of a tragic shooting that may otherwise have been avoided by proper deliberation whenever practical." *Id*. (cleaned up).

As in *Nicholson*, Pauu's allegations support the inference that the Deputy Defendants were not confronted with a rapidly escalating situation; instead, they faced a de-escalating situation with "minimal information" that required assessment before the use of deadly force.  Pauu alleges that when Talavera came to a stop, Pauu and his partners situated themselves around him in a cul-de-sac and waited for the Sheriff's deputies to arrive. (*Pauu* FAC ¶ 34.)  Pauu explains this was for the safety of the officers, the suspect, and the residents in the neighborhood.  (*Id*. ¶ 35).  The manner in which the officers had parked their patrol cars at the entrance of the cul-de-sac blocked the only way out.  (*Id*. ¶ 38.)  The officers knew that Pauu was downrange because the headlights from their patrol cars were pointed toward the detectives at the other end of the cul-de-sac.  (*Id*. ¶ 39.)  The Deputy Defendants were about fifty feet from Talavera when he produced a knife, and Talavera was surrounded by law enforcement in a cul-de-sac with no way out.  (*Id*. ¶ 40).  At the time the Deputy Defendants started shooting without warning, Talavera was moving sideways toward the ground.  (*Id*. ¶¶ 41, 44).  He never moved towards the deputies, (*id*. ¶ 41), or threatened anyone, (*id*. ¶ 42), and the situation was de-escalating, (*id.* ¶ 45), and Talavera was complying with the officers' commands (*Id*. ¶ 43).  Indeed, Deputy Lovejoy told members of the task force that he saw Pauu in his line of sight but fired anyway because he thought he "could make the shot."  (*Id*. ¶ 61.)  Accepting Pauu's allegations as true, as the Court must, they do not support the Deputy Defendants' contention that they were faced with a rapidly evolving situation where they had to make split-second decisions.  (*Pauu* Mem. at 16.)

To the extent Defendants argue that Pauu was not "in a position to see what the suspect was doing with his hands at the time the deputies began firing and does not allege that the [Deputy Defendants] knew that the object that the suspect produced was a knife—as opposed to [a] gun—at the time he produced a knife and was stumbling around," (*Pauu* Mem. at 19 (cleaned up)), the Court disagrees.  Pauu's allegations that he and the RATT detectives were situated around Talavera, (*Pauu* FAC ¶ 34), and the headlights from the officers' patrol cars were pointed toward them, (*id*. ¶ 39), support the inference that Pauu was able to see what the suspect was doing.  In any event, under *Nicholson*, whether Talavera was holding a knife or a gun or whether that gun was fake or real is immaterial given that situation was allegedly de-escalating.  In *Estate of Strickland v. Nevada County*, the Ninth Circuit recently clarified in the context of a Fourth Amendment excessive force claim that its decision in *Nicholson* did not hinge on the misidentification of the gun.  69 F.4th 614, 622 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024) ("[W]e did not find it dispositive [in *Nicholson*] that the gun turned out to be a 'toy'; instead, it was conclusive that the officer did not see the suspect 'point it at anyone' and nothing suggested the suspect 'was likely to harm anyone.'" (citing *Nicholson*, 935 F.3d at 694)).

Moreover, the Deputy Defendants' cases are distinguishable.  For example, *Porter* involved an officer facing an evolving set of circumstances that took place over a short period and a driver refusing to exit or stop his car.  546 F.3d at 1133.  *Peck v. Montoya*, 51 F.4th 877, 882 (9th Cir. 2022), similarly involved a suspect who was behaving erratically and threatening someone with a firearm, ignored the officers' warnings, picked up a gun, and began raising it toward them.  Unlike this case, which involved a de-escalating situation, both *Porter* and *Peck* involved deputies acting in the midst of high-pressure confrontations.  Further, on April 3, 2024, the Deputy Defendants requested the Court to take notice of the Ninth Circuit's recent decision in *Estate of Hernandez ex rel. Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1221 (9th Cir. 2024), in which the Ninth Circuit affirmed the conclusion of the district court, in the context of a summary judgment motion, that a one-second gap between two volleys of shots provided the officer with insufficient

time to reflect and, therefore, the "purpose to harm" standard applied. *Id.* at 1221–22. Video evidence revealed the entire interaction between the officer and suspect lasted about 20 seconds and "[a]ll six shots were fired within eight seconds." *Id*. at 1215.  In contrast to *Estate of Hernandez*, Pauu does not allege how long the entire interaction between Talavera and Deputy Defendants lasted.  Indeed, until Pauu, like the parties in *Estate of Hernandez*, has access to discovery, he is unlikely to have access to this information.  It is precisely for this reason that courts hesitate to decide whether the "deliberate indifference" or "purpose to harm" standard applies to excessive force cases at the motion to dismiss stage.  *See Bui*, 61 F. Supp. 3d at 901.

Consequently, even though discovery may ultimately prove otherwise, the Court concludes that the Complaint's allegations, taken as true and construed in Pauu's favor, show that the Deputy Defendants had sufficient time to make an unhurried judgment about their conduct upon seeing Talavera with a knife such that Pauu need only allege facts to support the deliberate indifference standard.  Further, a reasonable juror could conclude that the Deputy Defendants disregarded the known or obvious risk of injury to bystanders when they fired their weapons during a de-escalating situation without taking time to assess whether deadly force was necessary.  Based on the above, the Court concludes that Pauu alleges a viable Fourteenth Amendment claim.

### 2.    *Qualified Immunity*

Given the Court's conclusion that Pauu alleges a violation of the Fourteenth Amendment, the Deputy Defendants argue that they are entitled to qualified immunity.  The doctrine of qualified immunity protects government officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).    The Supreme Court has urged courts to resolve issues of qualified immunity at the earliest possible stages of litigation.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Nonetheless, "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making," *Keates v. Koile*, 883 F.3d

1228, 1234 (9th Cir. 2018), and dismissal under Rule 12(b)(6) on grounds of qualified immunity "is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (cleaned up).  "Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).  "If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiff [is] 'entitled to go forward' with [his] claims." *Keates*, 883 F.3d at 1235 (cleaned up).  Accordingly, at this early stage, "[d]etermining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *O'Brien*, 818 F.3d at 936.

The Court has already concluded that Pauu has satisfied the first prong.  *See supra* the Pauu Defendant Motion to Dismiss Section II.B.1.  The Deputy Defendants argue that it was not clearly established as of February 16, 2022, that a law enforcement officer could be liable to another law enforcement officer for violating his Fourteenth Amendment rights. (*Pauu* Mem. at 21.)  Pauu concedes "that never in the history of Constitutional jurisprudence has there ever been defendants who shot at fellow officers knowing that they were downrange behind a suspect who was complying with orders in a de-escalating situation with officers completely surrounding the suspect," but argues that "[q]ualified immunity is not available to defendants because 1) their unlawfulness was obvious; and 2) they were either incompetent or they knowingly violated the law."  (*Pauu* Opp'n at 15.) The Deputy Defendants also argue that Fourteenth Amendment claims are generally brought by surviving family members and not by the victim.  (*Pauu* Mem. at 21.) Ultimately, the Court concludes that the identity and the fate of the victim are irrelevant— *Nicholson* had already clearly established that, "in 'minimal information' situations, an

officer must take some time to assess what is happening before employing deadly force." 935 F.3d at 694.

### 3.  Conclusion

The Court is mindful that this case is in its earliest stages and that discovery may ultimately disprove Pauu's allegations, thereby changing the contours of the Court's standard of culpability and qualified immunity analysis.  Nevertheless, at this stage in the litigation, dismissal of Pauu's Fourteenth Amendment claim is not warranted because he plausibly alleges the violation of a clearly established constitutional right.  *Keates*, 883 F.3d at 1234–35; *also see Royzman v. Lopez*, No. 21-CV-1429-BAS-AHG, 2023 WL 2026537, at *13 (S.D. Cal. Feb. 15, 2023) (denying a motion to dismiss based on qualified immunity because the court could not determine on the face of the pleadings that immunity applies, and the defendants' arguments were unconvincing).  Accordingly, the Court **DENIES** the *Pauu* Defendants' Motion to Dismiss Pauu's second cause of action.

### C.  Third Cause of Action:  Supervisory Liability Against Gore and Does 1–25

Under § 1983, a government official is liable only for their own misconduct.  *Iqbal*, 556 U.S. at 677 ("In a § 1983 suit . . . where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  A supervisor may be liable in his individual capacity (1) "for his own culpable action or inaction in the training, supervision, or control of his subordinates;" (2) "for his acquiescence in the constitutional deprivation;" or (3) "for conduct that showed a reckless or callous indifference to the rights of others."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (cleaned up).  Supervisory officials may be held liable for failure to institute adequate policies based on their deliberate indifference, which may be shown through knowledge and acquiescence.  *Cross v. City & Cnty. of S.F.*, 386 F. Supp. 3d 1132, 1153 (N.D. Cal. 2019).

Pauu's First Amended Complaint seeks to hold Sheriff Gore and as-yet unidentified

supervisory Doe Defendants liable for their failure to train, supervise, and/or discipline their subordinates. (*Pauu* FAC ¶¶ 145–64.) Specifically, Pauu alleges that Does 1 through 25 are supervisors responsible for promulgating policies, investigating, and disciplining deputies, (*id.* ¶¶ 147–48), and they failed to investigate and/or discipline the Deputy Defendants who reported to them. (*Id.* ¶ 150.) Gore and Doe Defendants failed to supervise and train the Deputy Defendants, (*id.* ¶ 152); have a history of ratifying officer misconduct, (*id.* ¶ 153); were made aware of previous instances of excessive force "on information and belief," (*id.* ¶ 156); acquiesced in unconstitutional behavior by refusing to train, (*id.* ¶ 160); and were deliberately indifferent to Pauu's needs, (*id.* ¶ 162). Pauu also alleges that their failure to supervise and discipline the Deputy Defendants was the moving force behind Pauu's injury. (*Id.* ¶ 163).

The *Pauu* Supervisory Defendants argue that they cannot be held liable solely for their subordinates' violation of Pauu's constitutional rights, especially when Pauu does not allege that Gore or other supervisors were aware of prior, similar instances of excessive force. (*Pauu* Mem. at 25–27.) Defendants also contend that Pauu's allegations are deficient because they are based only on information and belief and fail to meet the federal pleading standard. (*Id.* at 27.) The Court agrees. *See Ashcroft*, 556 U.S. at 678 (though Rule 8 does not require detailed factual allegations, it demands more than an unadorned, "the-defendant-unlawfully-harmed-me accusation"). Pauu seeks to hold Gore and the supervisory Doe Defendants liable merely as part of the Deputy Defendants' chain-of-command. He fails plausibly to allege specific facts supporting a fair inference that the *Pauu* Supervisory Defendants had the requisite knowledge of prior incidences that would put them on notice of deficiencies in the training, supervision, or discipline of the Deputy Defendants. *See, e.g.*, *Cross*, 386 F. Supp. 3d at 1153 (granting the supervisory defendants' motion to dismiss in the absence of allegations that the supervisors were involved in some concrete way in the constitutional violation because the court cannot infer knowledge from a defendants' general role as a supervisor).

Further, though mere "acquiescence" may suffice to establish supervisory liability, Plaintiff offers no facts from which the Court can infer the *Pauu* Supervisory Defendants acquiesced in training deficiencies or failed to provide adequate supervision.  In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), for example, the Ninth Circuit reversed the trial court's dismissal under Rule 12(b)(6) of a prisoner plaintiff's supervisory liability claims where, in addition to numerous prior incidents, he alleged that the sheriff defendant had received a written notice about the ongoing constitutional violation from the United States Department of Justice, weekly reports from his subordinates responsible for reporting deaths and injuries in the jails, and reports from his Special Counsel and Office of Independent Review.  *Id.* at 1209.  Similarly, in *McDonald v. County of Sonoma*, 506 F. Supp. 3d 969 (N.D. Cal. 2020), the court concluded that a plaintiff adequately alleged a claim for supervisory liability when he identified specific policies, prior incidents, studies, audits, and reports that summarized the county's history of law enforcement misconduct, as well as the Sheriff's prior testimony against a fellow officer's use of excessive force. *Id.* at 983.

Such allegations are missing here.  Pauu does not allege that the *Pauu* Supervisory Defendants were personally involved in the shooting incident and, unlike in *Starr* and *McDonald*, he fails to identify prior incidents with any particularity that would support an inference that the *Pauu* Supervisory Defendants knew of or acquiesced in the Deputy Defendants' unconstitutional conduct.  Accordingly, the Court concludes that Pauu fails to allege a plausible claim for supervisory liability against Gore and Does 1–25, *see Manzo v. Cnty. of Riverside*, No. EDCV1701165JGBSPX, 2018 WL 6016970, at *12 (C.D. Cal. Jan. 23, 2018) (refusing to infer from a crime study, one prior incident, and a consent decree that the supervisory defendants knew or acquiesced in subordinates' unconstitutional conduct), and **GRANTS** Defendants' Motion to Dismiss Pauu's third cause of action with leave to amend.

1

### D. *Fourth Cause of Action:* **Monell** *Municipal liability Against the County*

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a plaintiff cannot sue a municipality under a theory of *respondeat superior* for the constitutional violations of its employees or agents.  Instead, municipalities are liable only when an "action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id*. at 691.  To state a claim under *Monell*, the plaintiff must allege (1) a deprivation of a constitutional right, (2) a policy, (3) which amounted to a deliberate indifference to the plaintiff's constitutional right, and (4) that the policy was the "moving force behind the constitutional violation."  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).  In the context of a motion to dismiss, the Ninth Circuit has made clear that claims of *Monell* liability must comply with the basic principles set forth in *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662.  *See A.E. v. Cnty. of Tulare,* 666 F.3d 631, 637 (9th Cir. 2012).  Thus, the following two rules govern the Court's evaluation of Pauu's *Monell* allegations: (1) the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively;" and (2) the "factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Id*. 636–37.

The Court has already determined that Pauu has adequately alleged a deprivation of his Fourteenth Amendment constitutional rights.  *See supra* the *Pauu* Defendants' Motion to Dismiss Section II.B.  The Court therefore examines whether Pauu sufficiently alleges a policy.  A plaintiff may plead a municipal policy under one or more of the following theories:  First, plaintiffs may rely on an express "policy statement, ordinance, regulation, or decision officially adopted and promulgated."  *Monell*, 436 U.S. at 690.  Second, even if no express policy exists, the plaintiff may show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity."  *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (cleaned up).  Third, a local

21

government may be held liable for injuries caused by the unwritten decision of a government official, but only when that official had "final policy making authority" over "the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997) (cleaned up).  Fourth, a plaintiff may establish that a local government failed to train employees in a manner amounting to deliberate indifference to a constitutional right.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  And fifth, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.  *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

Although Pauu initially sought to establish municipal liability under several theories,[3] he clarified in his Opposition that his *Monell* claim is premised on the County's *de facto* custom of "systemic failure to supervise and discipline, which created a culture of impunity leading officers to believe they could 'get away with anything,'" (*Pauu* Opp'n at 25), which the Court will shorthand as the "custom of permitting or condoning deputies' use of excessive force."  A plaintiff may sufficiently plead such a custom or practice by showing a pattern of prior similar incidents that are "of sufficient duration, frequency[,] and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, Pauu has alleged eleven prior incidents all touching generally on the issue of excessive force.  (*Pauu* FAC ¶¶ 71–92.)  The County argues that these incidents are too dissimilar to establish a custom or practice.  (*Pauu* Mem. at 23.)  Whether Pauu adequately alleges a custom or practice requires the Court to evaluate the quantity and quality of Pauu's allegations concerning the prior incidents.  However, "courts are somewhat split on

---

[3]      Specifically, Pauu's First Amended Complaint alleges *Monell* liability based on (1) the unconstitutional custom of providing improper and inadequate communication capabilities, (*Pauu* FAC ¶¶ 166–171); (2) failure to train deputies in the use of force, (*id.* ¶ 175); and (3) an unconstitutional custom of permitting or condoning deputies' use of excessive force.  (*Id.* ¶ 176; *see also Pauu* Opp'n at 24.)  In his Opposition, Pauu abandoned his *Monell* claims based on inadequate communication and training. (*Pauu* Opp'n at 24.)

the level of detail and the number of similar unconstitutional incidents a plaintiff must show to establish a longstanding practice or custom.  Some courts allow very generic allegations, and others require more details than a mere possibility that a policy exists." *Est. of Kong ex rel. Kong v. City of San Diego*, No. 22-CV-1858-BAS-DDL, 2023 WL 4939370, at *6 (S.D. Cal. Aug. 2, 2023) (cleaned up).  In *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792 (9th Cir. 2017), for example, the Ninth Circuit observed that even though it has "not established what number of similar incidents would be sufficient to constitute a custom or policy," allegations of "one or two incidents are insufficient to establish a custom or policy." *Id.* at 794.  Further, a plaintiff cannot establish a pattern by relying on "isolated or sporadic incidents," *Est. of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1208 (E.D. Cal. 2019) (quoting *Trevino*, 99 F.3d at 918), or "'contemporaneous or subsequent conduct.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011)).  Although courts are mindful that, at the motion to dismiss stage, plaintiffs necessarily have "limited access to details of governmental policies and training procedures prior to discovery," plaintiffs relying on prior incidents must still allege incidents that are "substantially similar in character." *Seever v. City of Modesto*, No. 121CV01373JLTEPG, 2022 WL 17418355, at *3 (E.D. Cal. Dec. 5, 2022).  "[T]he correct analysis focuses on the similarity between the 'factually pertinent' aspects of the prior incidents," including "the degree or type of force used by officers." *Id*. (quoting *McCoy v. City of Vallejo*, 2020 WL 374356, at * 4 (E.D. Cal. Jan. 23, 2020)).

In *Seever*, for example, the plaintiffs identified twelve prior incidents supporting the existence of a custom or practice.  *See id.*  Even though none of the twelve prior incidents closely paralleled the facts of the incident at hand, which involved the police shooting and killing "a twenty-nine-year-old running away from police at a church after the family called 911 to report his mental health crisis," the court found five incidents where officers discharged lethal weapons to be sufficiently similar.  *Id*. at *4–6.  By contrast, in *Bagos v. Vallejo*, No. 2:20-CV-00185-KJM-AC, 2020 WL 6043949, at *5 (E.D. Cal. Oct. 13, 2020), the court struck from a complaint, filed by a surviving plaintiff

whose claims did not involve a firearm allegation, those allegations of other incidents involving the lethal use of a firearm, profiling, sexual assault, and interference with the victim's ability to film officers on a cell phone because the standards and training in those scenarios differed from the general use of excessive force. *Id.*

The Court therefore discounts Pauu's allegations of prior incidents that involve the conduct of off-duty officers, the use of force other than a firearm, or violations of the First Amendment and those incidents that occurred after Pauu's injury, including the incidents involving Deputies Philpot, (*Pauu* FAC ¶¶ 72–74), Phillips, (*id.* ¶¶ 78–79), Peraza, (*id.* ¶ 86), and Lovejoy, (*id.* ¶ 90); the Lucky Phounsy incident, (*id.* ¶ 77); the Kristopher Birtcher incident, (*id.* ¶ 80); the Oscar Leal incident, (*id.* ¶¶ 82–83); the Li incident, (*id.* ¶ 85); and the Lee Lacy incident, (*id.* ¶ 87).  This leaves only two of Pauu's eleven prior incidents relevant: (1) a 2015 incident concerning the shooting death of a suicidal man named Gary Kendric, (*id.* ¶ 76); and (2) a May 2020 incident involving the shooting death of a mentally ill man named Nicolas Bils, (*id.* ¶ 84).  Pauu alleges that there was no internal affairs investigation after the Gary Kendric incident, (*id.* ¶ 76), and, even though the deputy in the Nicolas Bils incident pled guilty, the department failed to train its deputies.  (*Id.* ¶ 84.)  The gap of five years between these two incidents, however, weighs against finding that Pauu has alleged violations that are frequent and consistent enough to allege a sufficient custom or practice. *See Est. of Mendez*, 390 F. Supp. 3d at 1209 (concluding that a plaintiff failed to allege a custom or practice where there was a gap of five years between the oldest identified cases and the 2013 case and three years between the 2013 case and the 2016 case in a pattern of violations ranging approximately from 1998 to 2016).

In addition to challenging the sufficiency of Pauu's allegations concerning the existence of a policy or custom, the County contends that Pauu fails to allege that such a policy was the "moving force" behind his injury.  (*Pauu* Mem. at 24.)  At the motion to dismiss stage, however, the Court need not determine whether the alleged policy was in fact the moving force behind Pauu's injury; instead, the inquiry focuses on whether Pauu has alleged a sufficient pattern of prior constitutional violations to demonstrate plausibly

deliberate indifference regarding unreasonable force.  *See Est. of Mendez,* 390 F. Supp. 3d at 1197; *see also Escalante v. Villanueva*, No. 22-2590-MWF-KES, 2023 WL 2344208, at *5 (C.D. Cal. Feb. 16, 2023) (observing that even though the plaintiff may have to ultimately prove that the alleged custom caused the injury, at the motion to dismiss stage plaintiff only need to allege that the defendant's incoherent written policies created a vacuum, which allowed for a custom of frequent use of impermissible chokeholds to develop).  For the reasons discussed above, the Court concludes that Pauu's list of prior incidents fails to do so.  *See Oyenik*, 696 F. App'x at 794.  Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Pauu's fourth cause of action with leave to amend.

### E.   Requests for Judicial Notice

On February 13, 2024, Pauu requested that the Court take judicial notice of two "letters of concern" issued by the County of San Diego Citizens' Law Enforcement Review Board ("CLERB").  (Pauu Req. at 2.)  The *Pauu* Defendants object on the grounds that the CLERB issued the letters in response to Talavera's complaint.  (*Pauu* Defs.' Obj. at 2.) The *Pauu* Defendants also have requested that the Court take judicial notice of another CLERB document.  (*Pauu* Defs.' Obj. at 2–3 & Ex. A).  During the March 14 Hearing, the Court questioned the relevance of these documents, and Pauu's counsel withdrew the Pauu Request.  The Court has not relied on any of the CLERB documents offered in the Requests in resolving the *Pauu* Defendants' Motion; accordingly, the Court **DENIES AS MOOT** both Pauu's and the *Pauu* Defendants' Requests for Judicial Notice.

## III.   Conclusion

For the foregoing reasons, the Court **DENIES** Pauu's and the *Pauu* Defendants' Requests for Judicial Notice and **GRANTS IN PART AND DENIES IN PART** the *Pauu* Defendants' Motion to Dismiss.  Specifically, the Court **GRANTS** the *Pauu* Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' first, third, and fourth causes of action.  The Court otherwise **DENIES** the *Pauu* Defendants' Motion.

/ / /

### THE *TALAVERA* DEFENDANTS' MOTION TO DISMISS

## I.   Background

On the evening of February 16, 2022, while surveilling the El Cajon area in plain clothes and unmarked vehicles, the RATT detectives began pursuing Talavera and two others, whom they suspected of trailer theft. (*Talavera* Compl. ¶ 1.)  Rather than making the arrest themselves, the RATT detectives called for assistance from the Sheriff's Department. (*Id*. ¶¶ 45–46.)  The RATT detectives ultimately tracked down the trailer and Talavera's van in a cul-de-sac. (*Id*. ¶ 58.)  Even though the RATT detectives did not observe any weapons or dangerous behavior from the suspects, the detectives could not directly communicate their observations to the Sheriff's deputies who were in pursuit. (*Id*. ¶¶ 60–61, 63.)  As a result, the Sheriff's deputies struggled to find the location of the trailer and, by the time the first Sheriff's deputy arrived, two suspects had already left. (*Id*. ¶¶ 64–67.)

Lovejoy was the first Sheriff's deputy to arrive, and he initiated a traffic stop on the van. (*Id*. ¶¶ 67–68.)  Pursuant to a County policy that instructs officers to conduct "hot stops," which Talavera defines as traffic stop tactics in which deputies immediately aim firearms at a driver without determination of justification or necessity to use deadly force, Deputy Lovejoy quickly withdrew his weapon, aimed it at Talavera, and yelled at Talavera to "[g]et on the fucking ground" and "don't move." (*Id*. ¶¶ 71–72, 75.)  Deputy Young arrived next and, noticing a "hot stop" in progress, followed Lovejoy's lead and aimed his weapon at Talavera. (*Id*. ¶¶ 79–80.)  Both officers yelled contradictory commands, with Young yelling for Talavera to "[g]et on the ground" and Lovejoy yelling "[d]on't move." (*Id*. ¶¶ 81–83.)  Talavera was surrounded by law enforcement officials, and the Deputy Defendants, who stood approximately forty feet away, could see whether Talavera had anything in his hands because there were multiple bright lights, including ambient streetlights, directed at him. (*Id*. ¶¶ 84–85, 87–88.)

Talavera was not aggressive, did not exhibit aggressive body language, and did not threaten the Deputy Defendants, (*id*. ¶ 168); instead, he initially remained standing due to

the "contradicting commands, the sudden traffic stop, and threats" but later decided to follow the officer's commands by surrendering and getting on the ground.  (*Id.* ¶¶ 73, 76, 89.)  As he moved toward the ground, he placed a knife down next to him.  (*Id.* ¶ 90.)  The Deputy Defendants "had access to less-lethal means of subduing a noncompliant suspect" and had the opportunity "to utilize less dangerous means," (*id.* ¶ 170), but Deputy Lovejoy nevertheless tracked Talavera in the crosshairs of his firearm, which clearly revealed that Talavera was holding a knife.  (*Id.* ¶¶ 91–92.)  Even though Talavera moved to lie down as instructed, Deputy Lovejoy opened fire, followed by Deputy Young.  (*Id.* ¶¶ 104, 106.)  Deputy Young shot Talavera based on the assumption that Deputy Lovejoy had a legitimate basis for shooting, a phenomenon known as "sympathetic gunfire." (*Id.* ¶¶ 108–12.)  After the initial volley of shots, the Deputy Defendants paused their gunfire and could see that Talavera—who was not holding the knife and was lying on his stomach, moaning in pain from having been shot—did not pose a threat.  (*Id.* ¶¶ 120, 122.)  The deputies then yelled at Talavera to put his hands up or out, but Talavera reached for the knife.  (*Id.* ¶¶ 126–27.)  Deputy Lovejoy therefore opened fire again.  (*Id.* ¶ 129.)

During an initial interview conducted at the scene, the Deputy Defendants never claimed to have believed they saw Talavera with a gun, (*id.* ¶¶ 144, 147); however, Deputy Lovejoy eventually claimed he believed Talavera had a gun, (*id.* ¶ 162), and Young claimed to have confused Lovejoy's gunfire for shooting by Talavera.  (*Id.* ¶ 163.)  After the incident, Deputy Lovejoy also recounted that before Deputy Young's arrival on the scene or the commencement of any body-worn camera footage, Talavera threw up his hands and repeatedly said, "'[j]ust shoot me,'" (*id.* ¶ 165), which Talavera believes should have been "indicative of mental illness and/or depression."  (*Id.* ¶ 167.)  Consistent with the County's policy and practice of failing seriously to investigate use of force incidents, (*id.* ¶ 161), the County neither tried to segregate the Deputy Defendants nor maintained any recording of their interactions after they left the scene of the shooting.  (*Id.* ¶¶ 150, 154.)

1   Talavera remained in the Sheriff's Department's custody for most of 2022 because

2   of the charges stemming from the trailer theft.  (*Id.* ¶ 201.)  Talavera finally pled guilty to

3   being involved in the trailer theft and to a misdemeanor offense relating to the knife, (*id.*

4   ¶ 215) and was released from custody in December 2022.  (*Id.* ¶ 220.)

5   On November 27, 2023, Talavera filed this lawsuit alleging eleven causes of action:

6   (1) excessive force in violation of the Fourth Amendment against the Deputy Defendants

7   under § 1983; (2) failure to train against the County under § 1983; (3) maintaining an

8   unconstitutional custom or policy against the County under § 1983; (4) ratifying

9   subordinates' unconstitutional decision or action against the County under § 1983;

10   (5) excessive force in violation of the Fourth Amendment against Gore and Martinez under

11   § 1983; (6) battery against the Deputy Defendants; (7) assault against the Deputy

12   Defendants; (8) violation of the Bane Act against the Deputy Defendants and the County;

13   (9) negligence against the Deputy Defendants, the County, and Does 1–25; (10) negligent

14   hiring, training, and supervision under the California law against Gore, Martinez, the

15   County, and Does 1–25; and (11) intentional infliction of emotional distress against the

16   Deputy Defendants and the County.

17   **II.    Analysis**

18   The *Talavera* Defendants seek to dismiss Talavera's second cause of action against

19   the County for failure to train, third cause of action against the County for *Monell* liability,

20   the fourth cause of action against the County for ratification, the fifth cause of action

21   against Gore and Martinez for excessive force in violation of the Fourth Amendment, and

22   the eleventh cause of action against the Deputy Defendants and the County for intentional

23   infliction of emotional distress.  (*See generally Talavera* Mem.)  In addition to challenging

24   the legal sufficiency of Talavera's specific claims under Rule 12(b)(6), Defendants also

25   contend that all of Talavera's federal and state claims are barred by the preclusion doctrines

26   in *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Yount v. City of Sacramento*, 43 Cal. 4th

27   885 (2008).  (*Talavera* Mem. at 8–11.)  The Court will first analyze the *Heck* and *Yount*

28

preclusion doctrines followed by the legal sufficiency of Talavera's allegations underlying his second, third, fourth, fifth, and eleventh causes of action.

### A.    Heck *and* Yount *Preclusion*

*Heck* requires courts to consider whether a judgment in favor of the plaintiff in a § 1983 damages suit would "necessarily imply the invalidity" of that plaintiff's state conviction or sentence.  512 U.S. at 478.  "If it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1005 (9th Cir.), *cert. denied*, 143 S. Ct. 429 (2022) (cleaned up).  The California Supreme Court extended the *Heck* doctrine to state law tort claims through *Yount*.  43 Cal. 4th at 893–902.  The *Talavera* Defendants argue that the *Heck* doctrine bars Plaintiff's federal claims and that *Yount* bars Plaintiff's state law claims.  (*See Talavera* Mem. at 8–11.)

#### 1.    *Federal Claims*

The *Talavera* Defendants argue that *Heck* bars Talavera's federal claims because he pled guilty to the misdemeanor of "exhibit[ing] any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner." (*Talavera* Mem. at 8–10); *see also* Cal. Pen. Code § 417(a)(1).  Accordingly, Defendants request the Court take judicial notice of Talavera's Plea of Guilty filed October 14, 2022, in *People v. Erik Talavera*, San Diego Superior Court Case No. CE 411201 ("Plea Agreement").  (*Talavera* Defs.' Req. at 2.)

Because the *Heck* doctrine does not bar a § 1983 suit premised on excessive force that is temporally or spatially distinct from the factual basis for a conviction, Talavera contends his claim can proceed since his misdemeanor conduct occurred after he had been shot.  (*Talavera* Opp'n at 7 (citing *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)).)  Specifically, Talavera argues that even though the County charged him with the felony of resisting arrest, he pled guilty to the misdemeanor of "exhibiting a knife in a rude manner," which occurred after he had been shot and was lying prone on the ground.  (*Id.* at 5.)  Because the Superior Court struck the word "prone" from Talavera's Plea Agreement, however, the Parties disagree over the factual basis for the plea.  (*Compare id.*, *with*

*Talavera* Reply at 4–5.)  Talavera therefore requests that the Court take judicial notice of the transcript from the October 14, 2022, change of plea hearing, during which there was a discussion regarding the removal of the word "prone" from the Plea Agreement.

As an initial matter, the Parties' requests for judicial notice are improper.  "Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)).  "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.'"  *Id.* (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).  "But a court cannot take judicial notice of disputed facts contained in such public records."  *Id.* (citing *Lee*, 250 F.3d at 689).  Although it is customary for courts considering the *Heck* doctrine to take judicial notice of the relevant state court criminal proceedings, *see Patten v. Deschamps*, No. CV-18-1869-VAP (GJS), 2019 WL 1877617, at *3 (C.D. Cal. Feb. 19), *report and recommendation adopted*, 2019 WL 1276503 (C.D. Cal. Mar. 19, 2019), here, the Parties dispute the factual basis for Talavera's plea.  The Court therefore **DENIES** Talavera's and the *Talavera* Defendants' Requests for Judicial Notice.

Accordingly, "[a]ll factual allegations set forth in [Talavera's] complaint are taken as true and construed in the light most favorable to" him.  *Lee*, 250 F.3d at 688 (cleaned up).  For purposes of determining whether the *Heck* doctrine bars Talavera's federal claims, the Court therefore accepts the following version of events:  Rather than evade or threaten law enforcement, Talavera complied with the Deputy Defendants' commands by surrendering and lying on the ground.  (*Talavera* Compl. ¶¶ 73, 76, 89.)  As he moved toward the ground, he placed a knife on the ground next to him.  (*Id.* ¶ 90.)  Talavera's body was moving towards, or in, a laying position on the ground when the deputies fired their guns.  (*Id.* ¶ 94.)  Even though he moved to lay down as instructed, Deputy Lovejoy

and then Deputy Young opened fire. (*Id*. ¶¶ 104, 106.) After more than a dozen shots, the Deputy Defendants paused their gunfire and yelled for Talavera, who was lying on his stomach and moaning in obvious pain from having been shot, to put his hands up and out. (*Id*. ¶¶ 117, 122, 125–26.) Talavera then reached for the knife, eliciting further gunfire from Deputy Lovejoy. (*Id*. ¶¶ 127, 129.) The County agreed to release Talavera "with a sentence of probation in exchange for his admission to the trailer theft and a misdemeanor offense in which he 'exhibited a weapon, to wit a knife, in a rude manner while not acting in self-defense and prone, to a person in [his] presence.'" (*Id*. ¶ 216.) Talavera's "misdemeanor plea was based upon his admission that, after being unjustly shot more than a dozen times by the Deputy Defendants and while laying prone, it was rude for Talavera to curse them and exhibit the knife." (*Id*. ¶ 217.)

Taking these allegations as true and construing them in the light most favorable to Talavera, the Complaint suggests that the factual basis for Talavera's civil rights violation is distinct from that underlying his misdemeanor offense of exhibiting a knife in a rude manner, which occurred after the Deputy Defendants had already fired at least a dozen shots at him while he was lying compliant on the ground, even though those actions occurred during one continuous transaction. *Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1134 (9th Cir. 2011). Further, because "*Heck* is an affirmative defense," *Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024), dismissal is appropriate only when the defense is apparent on the face of the complaint. *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (setting forth the general rule that a Rule 12(b)(6) dismissal based on an affirmative defense is proper only when "the 'allegations in the complaint suffice to establish' the defense"); *see also Reginato v. City of San Diego*, No. 3:15-CV-01963-L-WVG, 2016 WL 11670029, at *3 (S.D. Cal. Aug. 23, 2016) (finding that plaintiff need not plead around the *Heck* defense.) Because the four corners of Talavera's Complaint suggest distinct factual bases for his civil rights claims and misdemeanor conviction, the Court concludes that the *Heck* defense does not warrant the dismissal of Talavera's federal claims at this stage in the litigation.

2.      *State Claims*

The *Talavera* Defendants also seek to dismiss Talavera's state law claims under *Yount*, 43 Cal. 4th 893–902, in which the California Supreme Court extended the *Heck* doctrine to state law tort claims.  (*Talavera* Mem. at 10.)  To determine whether a state tort claim is barred, "California courts employ a three-part test.  First, the court determines the acts or omissions that formed the factual basis for the conviction.  Then, the court determines what alleged misconduct forms the factual basis for the civil rights suit.  Finally, the court considers the relationship between the first two steps."  *Baday v. Kings Cnty.*, No. 20-CV-00644-ADA-SKO, 2022 WL 10631010, at *9 (E.D. Cal. Oct. 18, 2022) (cleaned up).  Because the Court's analysis under *Yount* is the same as that conducted under *Heck*, *see Baday*, 2022 WL 10631010, at *9, the Court adopts its above analysis, *see supra* the *Talavera* Defendants' Motion to Dismiss Section II.A.1, and concludes that *Yount* does not warrant dismissal of Talavera's state law tort claims.

3.      *Conclusion*

Based on the above, the Court concludes that neither *Heck* nor *Yount* bars Talavera's claims at the pleading stage.

**B.      Rule 12(b)(6)**

1.      *Second, Third, and Fourth Causes of Action:* Monell *Liability*

As discussed above, *see supra* the *Pauu* Defendants' Motion to Dismiss section II.D, under *Monell*, a plaintiff cannot sue a municipality under a theory of *respondeat superior* for the constitutional violations of its employees or agents but must instead demonstrate that "action pursuant to official municipal policy of some nature caused a constitutional tort."  436 U.S. at 691.  To allege a claim under *Monell*, the plaintiff must show (1) a deprivation of a constitutional right, (2) a policy, (3) which amounted to deliberate indifference to the plaintiff's constitutional right, and (4) the policy was the "moving force behind the constitutional violation."  *Mabe*, 237 F.3d at 1110–11.  Here, Talavera seeks to establish municipal liability through an unconstitutional longstanding practice or custom,

(*Talavera* Compl. ¶¶ 242–51); failure to train, (*id*. ¶¶ 234–41); and ratification, (*id*. ¶¶ 252–64), each of which the County seeks to dismiss.  (*Talavera* Mem. at 13–18.)

          a.     Third Cause of Action Against the County: Unconstitutional Policy or Custom

Talavera has satisfied the first element of the custom/practice claim (deprivation of a constitutional right) because he alleges the violation of his Fourth Amendment rights. (*Talavera* Compl. ¶¶ 226–33.)  As for elements two, three, and four, Talavera alleges that the Deputy Defendants aimed their firearms, failed to issue warnings, and repeatedly used deadly force against him under either an express policy or a long-standing custom of the Sherrif's Department and the County.  (*Id*. ¶ 243.)  Specifically, Talavera identifies the County's *de facto* "hot stop," (*id*. ¶¶ 244, 245; *Talavera* Opp'n at 15), and "sympathetic gunfire," (*Talavera* Compl. ¶¶ 110, 244, 245; *Talavera* Opp'n at 15), policies.  Talavera also alleges that the County was deliberately indifferent to the consequences of their policies, which were "so closely related to the deprivation of Talavera's right to be the moving force that caused the ultimate injury." (*Talavera* Compl. ¶¶ 246–47.)

To establish a long-standing custom, Talavera has alleged several incidents involving Deputy Jason Philpot and Defendant Deputy Lovejoy and seeks to incorporate by reference other instances of excessive force identified in the *Pauu* First Amended Complaint.  (*Id*. ¶¶ 171–200.)  The County argues that Talavera fails to demonstrate the existence of a *de facto* custom because the Complaint relies on incidents that are too dissimilar from the facts of this case. (*Talavera* Mem. at 13–22.)  The County also opposes Talavera's attempt to rely on incidents identified in the *Pauu* First Amended Complaint without either requesting judicial notice or attaching the *Pauu* First Amended Complaint to Talavera's own pleading.  (*Id*. at 15.)

Talavera alleges that the Deputy Defendants used excessive force in accordance with the County's *de facto* customs of conducting "hot stops" and engaging in "sympathetic gunfire."  (*Talavera* Compl. ¶¶ 72, 109.)  None of the prior incidents Talavera identifies, however, touches on these topics.  Even if the Court applies a less rigorous standard of

similarity, Talavera has still failed to allege a custom/practice claim.  As in *Seever*, which the Court analyzed above, *see supra* page 23, this case concerns an officer-involved shooting.  None of the prior incidents involving either Deputy Philpot or Deputy Lovejoy concerned the use of firearm, (*id.* ¶¶ 187–98), and some concern Deputy Philpot's off-duty activities.  (*Id.* ¶¶ 175, 177–78.)  For example, one incident involving Deputy Lovejoy, where he allegedly performed a traffic stop without justification and smacked the phone of a woman named Shyntia Phillips Abu, (*id.* ¶¶ 187–98), touches on First Amendment issues, which is factually distinct from the instant excessive force claims premised on use of a firearm.  *Bagos*, 2020 WL 6043949, at *6.  To allege a sufficient custom or practice claim, Talavera must, at the very least, identify prior incidents involving officer use of a firearm.  Further, there is a gap of 10 years between the 2010 incident involving Philpot and the 2020 Abu incident involving Lovejoy, which suggests an absence of a recurrent pattern of violations.  *See Est. of Mendez*, 390 F. Supp. 3d at 1197 (finding no pattern where incidents spanned from 1998 to 2016, with a five-year gap between the oldest cases and the 2013 case and a three-year gap between the 2013 case and the 2016 case).

Talavera also seeks to incorporate by reference numerous other instances of excessive force listed in paragraphs 51 through 63 of Pauu's First Amended Complaint. (*See Talavera* Compl. ¶ 183.)  The County opposes on the grounds that Talavera has neither requested the Court take judicial notice of nor attached to his pleading the *Pauu* First Amended Complaint.  Talavera fails to respond to this argument.  (*See generally Talavera* Opp'n.)

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja*, 899 F.3d at 1002.  Whether the district court incorporates a document by reference is a matter of discretion.  *Napear v. Bonneville Int'l Corp.*, 669 F. Supp. 3d 948, 957 (E.D. Cal. 2023). Even if a document is not attached to a complaint, "[it] may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *Id.*   However, "a

complaint's mere mention of the existence of a document is insufficient to incorporate the contents of a document.'' *Id.* (cleaned up); *see also Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) (noting that "limited quotation" of documents not attached to the complaint "does not constitute incorporation by reference").

Here, Talavera briefly references paragraphs 51 through 63 of the *Pauu* First Amended Complaint and fails to attach it to his pleading. Even if this is sufficient for the Court to incorporate Pauu's allegations by reference, as explained in detail above, *see supra* the *Pauu* Defendants' Motion to Dismiss section II.D., Pauu's allegations are insufficiently factually similar for the Court to infer a plausible custom or practice. Even coupled with the prior incidents alleged by Talavera—none of which included the use of a firearm, *see supra* the *Talavera* Defendants' Motion to Dismiss section II.B.1.a.—the Court concludes that the prior incidents identified are insufficient to state a plausible custom or practice. *Oyenik*, 696 F. App'x at 794. The Court therefore **GRANTS** the County's Motion to Dismiss Talavera's third cause of action with leave to amend.

> b.    Second Cause of Action Against the County: Failure to Train

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. However, "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021). Crucially, "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1081–82 (N.D. Cal. 2014) (citing *Connick*, 563 U.S. at 62). "Consequently, "[a] pattern

of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id*.

Talavera alleges that the County's training policies are inadequate in the following areas (1) providing alternatives to deadly force, (2) sympathetic gunfire, (3) de-escalation, (4) handling situations involving persons having a mental crisis or who are mentally ill, (5) communicating with suspects, (6) issuing warnings, (7) giving clear commands, and (8) the use of deadly force. (*Talavera* Compl. ¶ 235; *see also Talavera* Opp'n at 13.) The County argues that Talavera's failure to train claim fails because he has not sufficiently shown a pattern of similar constitutional violations by untrained employees. (*Talavera* Mem. at 16.) Talavera responds both that the list of prior incidents he provided is sufficient to put the County on notice and, further, that he is not required to allege a pattern of violations at the pleading stage because a single instance can trigger § 1983 liability. (*Talavera* Opp'n at 18.)

Although it is true that, "[i]n a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *Connick*, 563 U.S. at 63 (cleaned up), this so-called "single-incident liability" arises only when a municipality decides not to train its employees in an area where there is an obvious need for training to avoid constitutional violation. *Id*. at 63–64; *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th Cir. 2022). Accordingly, in very limited circumstances, a plaintiff can establish deliberate indifference without alleging a pattern of violations. In *Hyde*, however, the Ninth Circuit recently clarified that "[w]hile deliberate indifference can be inferred from a single incident when the unconstitutional consequences of failing to train are patently obvious, an inadequate training policy itself cannot be inferred from a single incident." *Id*. at 874 (cleaned up). Consequently, a plaintiff cannot "circumvent the pleading requirement for a failure-to-train claim" by relying on a single incident because "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program." *Id*. at 875 (citing *City of Canton,* 489 U.S. at 391).

Binding Ninth Circuit law does not support Talavera's contention that alleging a

single incident suffices to state his failure to train claim.  Indeed, *Hyde* requires Talavera specifically to plead the inadequacy of a training program through a pattern of similar constitutional violations.  *See id.* at 874; *see also Smith v. City of Marina*, ___ F. Supp. 3d. ___, No. 22-CV-07308-PCP, 2024 WL 34401, at *6 (N.D. Cal. Jan. 3, 2024) ("[T]o state a claim that challenges training, [the plaintiff] must plead allegations beyond the facts of the particular challenged incident 'suggesting that the training . . . was defective.'"); *Keith v. City of San Diego*, No. 22-CV-1226-MMA, 2023 WL 2347070 (S.D. Cal. Mar. 3, 2023) ("Plaintiff cannot avoid pleading a pattern of similar constitutional violations . . . .  As Plaintiff has only pleaded one incident and has not alleged any facts suggesting that the training was defective or that the City was on actual or constructive notice of any training deficiency, he fails to state a claim.").  Although Talavera has provided a list of prior incidents, for the reasons discussed above, *see supra* pages 33–35, those incidents cannot support his allegations of municipal liability under the failure to train theory for the same reasons they cannot support his custom or practice claim.  The Court therefore similarly concludes that Talavera fails to plead a sufficient failure to train claim.

Accordingly, the Court **GRANTS** the County's Motion to Dismiss Talavera's second cause of action with leave to amend.

c.   Fourth Cause of Action Against the County: Ratification of Subordinates' Unconstitutional Decision

Finally, a plaintiff may establish "municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation."  *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014) (cleaned up), *rev'd in part on other grounds*, 575 U.S. 600 (2015). Ratification requires an authorized policymaker to make a "conscious, affirmative choice." *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  The "mere failure to overrule a subordinate's actions, without more," *Lytle*, 382 F.3d at 987, or failure to discipline a subordinate, *Sheehan*, 743 F.3d at 1231, does not amount to ratification.

Defendants contend that Talavera's ratification claim fails because he has not alleged any act by a decision-making official that could constitute ratification.  (*Talavera* Mem. at 13.)  Talavera, on the other hand, identifies several paragraphs from his Complaint that he claims amount to ratification:

> ¶¶ 253 (encouraged and cultivated an organizational culture supporting unnecessary violence), 254 (ratified and condoned prior incidents of sympathetic gunfire), 255 (same for prior excessive force), 161 (failure to segregate Young and Lovejoy after shooting or maintain recordings impliedly ratified incident by enabling employees to fabricate justifications), 172–180 (Philpot never sanctioned and moved to training unit after multiple incidents of unlawful violence and bragging about criminal conduct in uniform), 198 (no remedial action after prior complaint of excessive force against Lovejoy).

(*Talavera* Opp'n at 19.)  The conclusory allegations in the paragraphs Talavera identifies, however, fail to adduce sufficient facts to support a plausible ratification claim.  *See, e.g.*, *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 803 (N.D. Cal. 2021); *see also Segura v. City of La Mesa*, 647 F.Supp.3d 926, 939 (2022) (finding conclusory protester's allegation "upon information and belief" that county ratified use of force).

Talavera also relies on *Robertson v. Bruckert*, 568 F. Supp. 3d 1044 (N.D. Cal. 2021), in which the district court concluded that the plaintiff had pled a sufficient ratification claim because the plaintiff had alleged that supervisory officials expressly agreed with an internal affairs investigation to find an officer's conduct in the various civil rights incidents appropriate.  *Id*. at 1049.  Analogizing to *Robertson*, Talavera argues in his Opposition that the County ratified Lovejoy's and Young's conduct when the County District Attorney published a letter in September 2022, finding that "it would have been unreasonable for either Lovejoy or Young to utilize less-lethal options" (the "September 2022 Letter").  (*Talavera* Opp'n at 21 n.6.)  The September 2022 Letter, however, does not appear in Talavera's Complaint, and Talavera cannot amend his Complaint through his Opposition.  *See, e.g.*, *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998).

Because the Court concludes that Talavera has not sufficiently pled a ratification claim, the Court **GRANTS** the County's Motion to Dismiss Talavera's third cause of action with leave to amend.

2.     *Fifth Cause of Action Against Gore and Martinez: Supervisory Liability*

The *Talavera* Supervisory Defendants seek to dismiss Talavera's claims for supervisory liability against them because Talavera has not alleged their specific personal participation but instead relies on their general authority in the chain-of-command. (*Talavera* Reply at 7.)   The Supervisory Defendants also argue that Gore and Martinez cannot be liable for adopting and implementing education and training protocols because that is the responsibility of the California Commission on Peace Officer Standards and Training ("POST").   (*Id*. at 8.)   Talavera responds that his claims against the *Talavera* Supervisory Defendants are viable because (1) "[s]upervisors need not directly or personally get involved in the 'same way as . . . the individual officers who are on the scene inflicting constitutional injury[,]'" (*Talavera* Opp'n at 12 (quoting *Starr*, 652 F.3d at 1202)), and (2) Gore was the Sheriff and Martinez was the Undersheriff and the Acting Sheriff at the time of the shooting.   (*Id*.)   Further, Talavera states he specifically alleged Gore's and Martinez's action or inaction in the training and supervision of subordinates and there is no requirement that he "point to and plead an overt act or statement from which supervisory liability flows."   (*Talavera* Opp'n at 12–14.)

Talavera offers the following formulaic and conclusory allegations:   the *Talavera* Supervisory Defendants "duly enacted, adopted, encouraged, and enforced the [ ] inadequate training policies," (*Talavera* Compl. ¶ 266); had a direct role in the supervision as members of Lovejoy and Young's chain-of-command, (*id*. ¶ 267); had a direct role in the adoption and implementation of the County's unconstitutional policies, (*id*. ¶ 269); "knew Lovejoy and Young should have been disciplined, retraining implemented, new procedures and policies established, and their supervisors and peers similarly examined and retrained to reasonably ensure compliance with the constitution," (*id*. ¶ 270); and "were

aware that Lovejoy and/or Young had used unlawful, excessive force in the past but ratified, condoned, and encouraged their behavior as well as similar behavior by other deputies," (*id.* ¶ 271). These allegations contain no specific facts supporting a fair inference that the *Talavera* Supervisory Defendants had the requisite knowledge of prior incidences that would put them on notice of deficiencies in the training, supervision, or discipline of the Deputy Defendants. *See, e.g.*, *Cross*, 386 F. Supp. 3d at 1153. For example, Talavera has sued Martinez solely because she was the Acting Sheriff at the time of the shooting, which alone is insufficient for the Court to infer her "deliberate indifference." *See Ashcroft*, 556 U.S. at 677. Further, while mere "acquiescence" may suffice for supervisory liability, Talavera offers no concrete facts from which the Court can infer the *Talavera* Supervisory Defendants acquiesced to the training deficiencies or failed to provide adequate supervision.

Talavera cites to *Starr*, 652 F.3d 1202, and *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), in support of his supervisory liability claim. (*Talavera* Opp'n at 12–13.) Those cases do not support Talavera's position, however, because the supervisors in those cases had far more involvement in and awareness of the constitutional violations at issue than Gore and Martinez did here. In *Larez*, for example, the Ninth Circuit affirmed the district court's denial of a motion for a new trial where the jury concluded that a supervisory was liable in his individual capacity based on expert testimony denouncing his conduct as well as a letter from the supervisor informing the plaintiff that none of his many complaints would be sustained. 946 F.2d at 646. As discussed above, *see supra* the *Pauu* Defendants' Motion to Dismiss section II.C, the supervisory defendant in *Starr* received notice of the constitutional violations at issue through numerous and varied reports. 652 F.3d at 1209. Such allegations are missing here. *See, e.g.*, *Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1033–34 (N.D. Cal. 2022) (finding conclusory allegations similar to Talavera's insufficient to support a supervisory liability claim).

The Court therefore **GRANTS** the Supervisory Defendant's Motion to Dismiss

Talavera's fifth cause of action with leave to amend.[4]

### 3. *Tenth Cause of Action Against Gore, Martinez, and the County: Negligent Hiring, Retention, Training, and Supervision*

Under California law, all government tort liability must be based on statute.  Cal. Gov't Code § 815; *see also AE ex rel. Hernandez*, 666 F.3d at 638.  California Government Code § 815.2 makes a public entity vicariously liable "for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  Cal. Gov't Code § 815.2(a).

Talavera alleges that Martinez and Gore had a duty to ensure that the Sherriff's Department hired officers who were fit to perform their duties, and that they breached that duty by failing "to intervene, train, reprimand, discipline" the Deputy Defendants despite Martinez's and Gore's knowledge of prior incidents involving the deputies.  (*Talavera* Compl. ¶¶ 317–25.)  Further, because these acts occurred in the scope of Martinez's and Gore's employment, the County is also liable under California Government Code § 815.2.  (*Talavera* Compl. ¶ 327.)   Defendants argue that dismissal of the tenth cause of action is warranted because Talavera is trying to collapse the *Monell* claim for failure to train into *respondeat superior* liability.  (*Talavera* Mem. at 18.)  Talavera, however, contends that his negligence claim arises under state law and not under *Monell*.  (*Talavera* Opp'n at 22.)  Defendants respond that Talavera fails to state a claim because neither Gore nor Martinez knew of their employees' dangerous propensities.  (*Talavera* Reply at 10.)

A plaintiff may bring a claim against a public entity and its administrators for negligent hiring, retention, and supervision under a theory of vicarious liability.  *Est. of Osuna v. Cnty. of Stanislaus*, 392 F. Supp. 3d 1162, 1180–83 (E.D. Cal. 2019).  However,

---

[4]    The *Talavera* Supervisory Defendants requested the Court take judicial notice of Sheriff Gore's retirement and Sheriff Martinez's appointment dates.  (*See Talavera* Defs.' Req. at 2.)  Because Talavera's supervisory liability is premised on Gore's and Martinez's conduct in their individual capacities rather than in their official capacities, the Court **DENIES AS MOOT** Defendants' Request.

"to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). Because California law does not recognize a general duty of care, "for a public employee to be liable for negligent hiring, training, retention, or supervision, and in order for the governmental employer to be vicariously liable through § 815.2(a), there must be a 'special relationship' that exists between the plaintiff and the public employee supervisor." *Strawn v. Sokoloff*, No. 22-CV-1245 AWI, 2023 WL 2760904, at *10 (E.D. Cal. Apr. 3, 2023). Thus, "whether [a supervisory defendant] . . . may be held directly liable for negligent hiring, retention, and failure to train, and whether the County . . . may be held vicariously liable on that basis, turns on whether [the supervisory defendant] . . . had a special relationship with the [plaintiff]." *Est. of Osuna*, 392 F. Supp. 3d at 1182–83.

Because Talavera does not allege any facts from which the Court can infer the existence of a special relationship between Talavera and Martinez or Gore, he fails to allege a plausible claim for supervisory liability against them. *See id.* at 1183 (collecting cases declining to find a special relationship between an arrestee and purely supervisory law enforcement officials). Similarly, because Talavera fails to allege a plausible claim against Martinez or Gore, he also fails to state a claim against the County. *See Osuna*, 392 F. Supp. 3d at 1183. Accordingly, the Court **GRANTS** the Supervisory Defendant's Motion to Dismiss Talavera's tenth cause of action with leave to amend.

> 4. *Eleventh Cause of Action Against Lovejoy, Young, and the County: Intentional Infliction of Emotional Distress*

Talavera brings the intentional infliction of emotion distress ("IIED") claim against the Deputy Defendants and seeks to hold the County vicariously liable for the Deputy Defendants' conduct under California Government Code § 815.2. (*Talavera* Compl. ¶¶ 328–33.) To state a claim for IIED, a plaintiff must allege that (1) defendant engaged in extreme and outrageous conduct with the intention of causing, or with reckless disregard

of the probability of causing, emotional distress; (2) plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate causation of the plaintiff's emotional distress.  *McDonald*, 506 F. Supp. 3d at 987.  Conduct is outrageous when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Jaramillo v. City of San Mateo*, 76 F. Supp. 3d 905, 926 (N.D. Cal. 2014).

Defendants state that the Complaint fails to identify what conduct is "outrageous" and fails to allege that Talavera suffered severe or extreme emotional distress.  (*Talavera* Mem. at 20–21.)  In response to Defendants' first challenge, Talavera argues the Complaint contains the following allegations of "outrageous conduct:"

> Both [Lovejoy and Young] intentionally shot [him] without any reasonable basis for doing so.  [*Talavera* Compl.] ¶¶ 105 & 113.  They did so despite having the opportunity to deliberate, *id*. ¶ 103; seeing him obeying their commands and getting on the ground, *id*. ¶¶ 3, 89–90, 93.  They shot him knowing he did not have a gun and held only a knife, which he was placing on the ground to surrender, and that [Plaintiff] could not harm them.  *Id*. ¶¶ 97–98, 101–02.  They continued to fire beyond what was necessary to incapacitate [him].  *Id*. ¶ 119.  Then, after pausing and knowing they'd shot [him] many times such that he "could not . . . endanger anyone," Lovejoy shot him some more.  *Id*. ¶¶ 122, 125, 128–29.

(*Talavera* Opp'n. at 9.)  Because "[e]xtreme or outrageous conduct includes use of excessive force against a suspect," *McDonald,* 506 F. Supp. 3d at 987, the Court concludes that Talavera has sufficiently alleged extreme or outrageous conduct.

As for Defendants' second argument, Talavera asserts that he sufficiently alleges "serious emotional distress" because he experiences lasting mental trauma, post-traumatic stress disorder, depression, fear, anxiety, loss of sleep, and basic mental anguish after the shooting.  (*Talavera* Compl. ¶¶ 214, 224, 230, 313.)  Allegations of reactions such as "fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry" are sufficient to satisfy the "severe or extreme emotional distress" element of the IIED claim.  *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 737 (9th Cir. 1986); s*ee also Jaramillo*, 76 F. Supp. 3d at 926 (denying the defendant officers' request for summary

adjudication of IIED claim where the plaintiff stated that he was "'traumatized and terrified of the police officers' as a result of the alleged force they exercised on him, and continue[d] to be 'traumatized by th[e] incident and fearful of police'").  Thus, the Court concludes that Talavera has sufficiently pled severe or extreme emotional distress.

Because the Court concludes that Plaintiff sufficiently alleges the elements of his IIED claim, the Court **DENIES** the Deputy Defendants' and the County's Motion to Dismiss Talavera's eleventh cause of action.

## III.   Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** the *Talavera* Defendants' Motion (*Talavera* ECF No. 6) and **DISMISSES WITHOUT PREJUDICE** Talavera's second, third, fourth, fifth, and tenth causes of action.  The Court otherwise **DENIES** the *Talavera* Defendants' Motion.  The Court also **DENIES** Talavera's and the *Talavera* Defendants' Requests for Judicial Notice (*Talavera* ECF Nos. 6-2, 9-1).

## CONCLUSION

To summarize, for the reasons stated above, the Court **DENIES** Pauu's and the *Pauu* Defendants' Request for Judicial Notice (*Pauu* ECF Nos. 26, 27) and Talavera's and the *Talavera* Defendants' Requests for Judicial Notice (*Talavera* ECF Nos. 6-2, 9-1) and **GRANTS IN PART AND DENIES IN PART** the *Pauu* Defendants' Motion to Dismiss (*Pauu* ECF No. 22) and the *Talavera* Defendants' Motion to Dismiss (*Talavera* ECF No. 6).  Specifically, the Court **GRANTS IN PART** the *Pauu* Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Pauu's first, third, and fourth causes of action.  The Court **GRANTS IN PART** the *Talavera* Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Talavera's second, third, fourth, fifth, and tenth causes of action.  The Court otherwise **DENIES** both the *Pauu* Defendants' and *Talavera* Defendants' Motions.  Finally, because dismissal of the aforementioned claims is without prejudice, the Court **GRANTS** Pauu and Talavera each leave to file an amended complaint in his respective case addressing the above-enumerated deficiencies <u>within thirty (30) days</u>

of the date this Order is electronically docketed.  *Any Plaintiff who fails timely to file an amended complaint will proceed only on his remaining causes of action.*

**IT IS SO ORDERED.**

Dated:  June 13, 2024

Honorable Todd W. Robinson
United States District Judge